

**IN THE**
**TENTH COURT OF APPEALS**

————————————

**No. 10-13-00223-CV**

**IN THE INTEREST OF**
**D.D., C.C., C.C., AND C.C., CHILDREN**

————————————

**From the 361st District Court**
**Brazos County, Texas**
**Trial Court No. 12-000325-CV-361**

———————————————————————————————————————————

## MEMORANDUM  OPINION

———————————————————————————————————————————

Raising one issue with four subparts, which we will treat as four issues, Appellant G.R. challenges the trial court's order of termination of her parental rights to her four children.[1]  We will affirm.

Appellant's children were removed after D.D. was brutally attacked and sexually assaulted by C.B., Appellant's thirteen-year-old nephew.  Appellant had left all four of the children in C.B.'s care while she went to the store.

After a bench trial, the trial court found the following predicate violations as

---

[1] The four children and their ages at the time of removal are D.D. (4), C-1 (3), C-2 (2), and C-3 (10 months). The parental rights of the father of D.D. and of the father of C-1, C-2, and C-3 were also terminated, but they have not appealed.

grounds for termination of Appellant's parental rights: (1) Appellant knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being (Family Code subsection 161.001(1)(D)); (2) Appellant engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being (Family Code subsection 161.001(1)(E)); and (3) Appellant failed to comply with provisions of a court order specifically establishing actions necessary for the parent to obtain return of the children (Family Code subsection 161.001(1)(O)). The trial court also found that termination of Appellant's parental rights was in the children's best interest.

In a proceeding to terminate the parent-child relationship brought under section 161.001, the Department must establish by clear and convincing evidence two elements: (1) one or more acts or omissions enumerated under subsection (1) of section 161.001, termed a predicate violation; *and* (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(1), (2) (West Supp. 2013); *Swate v. Swate,* 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied). The factfinder must find that both elements are established by clear and convincing evidence, and proof of one element does not relieve the petitioner of the burden of proving the other. *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex. 1976); *Swate,* 72 S.W.3d at 766. If multiple predicate violations under section 161.001(1) were found in the trial court, we will affirm based on any one ground because only one predicate violation under section 161.001(1) is necessary to a termination judgment. *In re T.N.F.,* 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet.

denied), *overruled in part on other grounds by In re A.M.*, 385 S.W.3d 74, 79 (Tex. App.—Waco 2012, pet. denied).

## Predicate Violation

In issue three, Appellant contends that there is no or insufficient evidence to support the finding that she failed to comply with the provisions of a court order specifically establishing the actions necessary for the parent to obtain return of the children who have been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children.

The standards of review for legal and factual sufficiency in termination cases are well established. *In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency). In reviewing the legal sufficiency, we view all the evidence in the light most favorable to the finding to determine whether a trier of fact could reasonably have formed a firm belief or conviction about the truth of the Department's allegations. *In re J.L.*, 163 S.W.3d 79, 84-85 (Tex. 2005); *J.F.C.*, 96 S.W.3d at 265-66. We do not, however, disregard undisputed evidence that does not support the finding. *J.F.C.*, 96 S.W.3d at 266. In reviewing the factual sufficiency of the evidence, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* We must consider the disputed evidence and determine whether a reasonable fact-finder could have resolved that evidence in favor of the finding. *Id.* If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or

conviction, the evidence is factually insufficient. *Id.*

Appellant's brief asserts that she made a "concerted effort" to comply with her court-ordered service plan, but Appellant admitted on cross-examination that she did not complete her service plan. On direct examination, she had testified: "I feel like I've done -- I'm still – I'm still am doing the best I can, and still willing to do whatever needs to be done." Michelle Hudiburgh, the Department caseworker, also testified that Appellant did not complete her service plan. Moreover, Appellant admitted that she was given a fair opportunity to complete her service plan, that other than changing counselors, nothing had kept her from completing her service plan, and that she had understood that if she did not complete her service plan, her rights could be restricted or terminated.

The Family Code does not provide for substantial compliance with a court-ordered service plan under subsection 161.001(1)(O), nor does subsection 161.001(1)(O) allow for excuses for failure to complete the service plan. *In re R.N.W.*, No. 10-11-00441-CV, 2012 WL 2053857, at *2 (Tex. App.—Waco June 6, 2012, no pet.) (mem. op.); *see also In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

Because the evidence is legally and factually sufficient to support the trial court's finding that Appellant failed to comply with the provisions of a court order specifically establishing the actions necessary for her to obtain return of her children, we overrule issue three. We thus need not address issues one and two, which are sufficiency complaints against the trial court's subsection 161.001(1)(D) and subsection 161.001(1)(E) findings.

**Best Interest**

In her fourth issue, Appellant asserts that the evidence is legally and factually insufficient to support the trial court's finding that termination was in the children's best interest. In determining the best interest of a child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72. This list is not exhaustive, but simply indicates factors that have been or could be pertinent. *Id.*

The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't Prot. & Reg. Serv's.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). The goal of establishing a stable permanent home for a child is a compelling state interest. *Id.* at 87. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.*, 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc).

Evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *see also In re V.A.*, No. 13-06-00237-CV, 2007 WL 293023, at *5-6 (Tex.

App.—Corpus Christi 2007, no pet.) (mem. op.) (considering parent's past history of unstable housing, unstable employment, unstable relationships). A factfinder can infer from a parent's failure to work programs offered by the Department that the parent "did not have the ability to motivate herself to seek out available resources needed … now or in the future." *In re W.E.C.,* 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.). Evidence of a parent's home and job instability can show a lack of parental abilities. *Doe v. Brazoria Cty. Child Prot. Serv's.,* 226 S.W.3d 563, 574 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Evidence of a recent improvement does not absolve a parent of a history of irresponsible choices. *In re T.C.,* No. 10-10-00207-CV, 2010 WL 4983512, at *8 (Tex. App.—Waco Dec. 1, 2010, pet. denied) (mem. op.); *Smith v. Tex. Dep't Prot. & Reg. Serv's.,* 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.).

In February 2012, Appellant, who was age twenty-three at the time of trial, was living in a three-bedroom apartment in College Station with her four young children; she was unemployed. On February 3, Appellant left the children in the care of her thirteen-year-old nephew C.B. while she allegedly went to the store with her sister, C.B.'s mother. No adult was with the children, and police estimated that the children were alone with C.B. for at least two hours. Sometime between 1:00 pm and 3:00 pm, C.B. brutally attacked and sexually assaulted D.D., who was age four. After the attack, C.B. called his mother and then called 9-1-1. Police contacted Appellant, who went to the hospital.

Police officer Angela Thomas first saw D.D. in the hospital on the evening of February 3, and D.D. was in "extremely poor" condition; she was unconscious and

breathing only with a ventilator because of swelling in the brain, and she was covered in marks and bruises. A rape exam revealed that D.D. had been sexually assaulted. C-1 had been slapped in the face, but the other two children were not injured that day. Thomas said that at least C-1 was a witness to C.B.'s attack on D.D., and the children's therapist believes that all three children witnessed the attack, though C-3 was only ten months old. D.D. was transferred to a Houston hospital for eleven days and then to a Dallas rehabilitation hospital for another thirty days. While D.D. was in Dallas, Appellant asked Hudiburgh to see D.D. only twice.

Thomas and Officer Benton Keough, who together investigated the assault, both thought that C.B. was developmentally delayed. Thomas said that C.B. was immature for his age, that he was not suitable to have been left to care for the four young children, and that Appellant had placed the children in a dangerous situation. Keough said that leaving the children with C.B. placed them in danger and that C.B. became combative and aggressive during one of their interviews. C.B. was ultimately arrested for the assault.

Thomas interviewed Appellant, who acted as if nothing had happened to her children and seemed unconcerned about D.D., who was in intensive care. Appellant admitted to Thomas that she should not have left C.B. with the children, and Thomas said that Appellant knew of a prior incident where C.B. has possibly stuck a stick in the anus of another relative's child. Appellant denied previously knowing of that allegation, saying that she had learned of it from a CPS investigator after the attack on D.D. Appellant admitted to knowing that C.B. had gotten in trouble at school for

fighting and had been fighting with neighborhood children. On the day of the assault, C.B. was not in school because he had been suspended from riding the bus because of an outburst. Although her children had been around C.B. a lot and he had helped care for them, Appellant said that she had never before asked him to care for the children by himself. She admitted that it was a mistake to leave the children in the care of C.B.

After visiting the hospital, Thomas went to Appellant's apartment. It was "unkempt" and "dirty," there was not sufficient food, and there was a pornographic DVD. On February 4, Thomas interviewed C.C., the father of C-1, C-2, and C-3, who was not at the apartment the day before. C.C. was arrested that day on an outstanding warrant for family violence against Appellant; C.C. and Appellant were well-known to the police because of multiple incidences of domestic violence. Appellant initially cooperated with law enforcement with respect to D.D.'s assault and the prosecution of C.B., but as C.B.'s trial date approached, she stopped cooperating—in Keough's opinion, to protect C.B.

Hudiburgh testified that the children's basic needs had not been met by Appellant; they had eating issues, developmental delays, sleeping issues, and speech problems. The three older children had rotten teeth, and D.D. and C-1 had to have complete dental surgery. Appellant admitted that she knew the children's teeth were rotting and said she had taken them to the dentist and had future appointments set up, but she could not recall how many times the children had been to the dentist. All of the children were behind on their vaccinations, and C-3 may not have had any.

Rachel, the foster mother of the three oldest children, testified about their

condition when they came into foster care. C-2 was anxious and crying, C-1 was aggressive and "bouncing off the walls," and D.D. was very quiet and withdrawn and sucked her thumb a lot. The children used a lot of bad language, exhibited physical aggression, and had eating issues. D.D. and C-2 required speech therapy, but Appellant believed that the children did not have speech problems. D.D. and C-1 acted out sexually. Appellant denied observing that conduct or their regular use of foul language, though she admitted that they would repeat bad words if they heard them. Appellant believed that the children were on target developmentally when they were removed.

Karen Coffman, the three oldest children's therapist, said that D.D. was initially very non-trusting and difficult to engage in play, that C-1 was very aggressive, difficult to engage in play, and used inappropriate language, and that C-2 was extremely anxious. All of them were "hypervigilant" and did not seem to know how to play, which Coffman said was a sign of abuse or neglect because it shows that the children are too busy guarding against danger to play. D.D. and C-1 both told Coffman that C.C. had beaten them and that Appellant had beaten them with a belt; they both were afraid of Appellant. Appellant denied beating the children with a belt but did admit to spanking them. Coffman said that, in addition to witnessing C.B.'s assault of D.D., the children were traumatized from previous incidents of seeing C.C. taken away by the police and from different relatives coming in and out of their lives.

Also, C-1 disclosed to Coffman that C.C. had sexually abused her and that Appellant had witnessed it. Appellant denied observing any sexual abuse. Appellant

testified that, at the time of trial, she was not in a relationship with C.C., but she had been as recently as a month before. On occasion she had left C.C. to care for the children, and there were times that C.C. had lived with them and that they had lived with C.C. Appellant admitted that she had heard that C.C. had a drug problem. She also admitted that there had been domestic violence incidents with C.C. and that he had hit her once or twice in front of the children, though she later said that the children had only witnessed verbal altercations.

While the children were in foster care, Appellant had supervised visitation. Appellant said that she missed only a couple of visits, but Hudiburgh said that she missed at least six. Hudiburgh said that in the visits, the children's reaction to Appellant showed a lack of bonding and that Appellant showed few parenting skills. Also, the children would regress in their behavior and act out around Appellant. Over time, Appellant's interaction with the children improved, but the children were exhibiting anxiety before Appellant's visits and it took days for them to recover from the emotional trauma. The Department thus stopped Appellant's visitation with the three oldest children on the recommendation of their therapist that the visitations were emotionally traumatic and were impeding their therapeutic process.

Hudiburgh said that the three oldest children were doing "wonderfully" in foster care and had progressed from being behind developmentally. C-3 was in a separate foster home because the aggression of the older children posed a risk to her, and her foster parents were considering adoption. No relative placements were found to be suitable for the children. A potential adoptive home for the three oldest children

had been located.

Coffman, the children's therapist, said that it would be detrimental to return the children to Appellant; it would put them in emotional or physical danger, and it would be very difficult for Appellant to regain the children's trust. Coffman thought that termination of Appellant's parental rights was in the children's best interest.

Appellant argues that she made mistakes with the children but that she has learned from those mistakes and the children should thus be returned to her. Appellant acknowledged that it would be difficult for the children if they were returned to her, and her plan was that if they were returned, she would get her GED and then attend nursing school. Appellant testified that it would be in the children's best interest to come home. She had started working on her GED when the children were removed but stopped and did not finish. Following the children's removal, Appellant lost her subsidized apartment and moved to Washington, Texas and then to Bryan. At the time of trial, Appellant had been living in an apartment in Bryan; her boyfriend had paid the rent some of the time, but Appellant had recently been paying the bills. She was working at a gas station for the last month and a half and mostly working the night shift.

The children's CASA volunteer, who had been assigned to the case since the children had been removed, testified that it was in the children's best interest for Appellant's parental rights to be terminated. While she had seen some temporary improvement in Appellant's parenting skills, she thought that Appellant was quick to fall back into old habits. Hudiburgh said that it was also the Department's

recommendation that Appellant's parental rights be terminated and that it was in the children's best interest. Hudiburgh said that Appellant had not demonstrated that she could provide a safe environment for the children because she had not complied with her service plan and had not shown a willingness or ability to give them a safe or appropriate home.

Considering all the evidence in relation to the *Holley* factors in the light most favorable to the trial court's finding, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination was in the children's best interest. For Appellant's factual sufficiency complaint on best interest, after considering all of the evidence, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination was in the children's best interest. The evidence is legally and factually sufficient to support the trial court's best-interest finding.

We overrule Appellant's fourth issue and affirm the trial court's order of termination.

REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed
Opinion delivered and filed December 27, 2013
[CV06]